## CATHERINE H. FEENEY *v*. DONALD EUGENE DOLAN ET AL.

[No. 700, September Term, 1976.]

*Decided April 11, 1977.*

The cause was argued before THOMPSON, MOYLAN and MOORE, JJ.

*Patrick A. O'Doherty*, with whom was *Guy M. Albertini* on the brief, for appellant.

*Robert E. Cadigan*, with whom were *Smith, Somerville & Case* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

Dissatisfied with a jury verdict of $20,000 after a trial in which liability was admitted for personal injuries sustained by appellant in a collision between her car and a dump truck, she filed a motion for a new trial. In addition to the general grounds customarily assigned, it was claimed in the motion that the trial court erred in certain rulings on the

admissibility of evidence. This appeal has been taken, not from the overruling of the motion, but from the verdict and judgment entered. It is contended on appellant's behalf that the trial court "committed prejudicial errors which denied the plaintiff-appellant a fair trial and an adequate recovery for the injuries sustained." [1] Specifically, it is claimed that under the facts of this case, the trial court erred:

1. In refusing to allow redirect examination of appellant's neurological surgeon on the issue of causal relationship between the accident and the injury;

2. In permitting defense counsel to establish that the appellant and her fiance shared a motel room on a trip to Florida;

3. In permitting defense counsel to refer in opening statement to a Workmen's Compensation commission award to the appellant of 30% permanent disability by reason of a prior injury to her low back and in permitting counsel to read to the jury the Order of the Commission.

We find the second and third assignments of error to be without merit; and while in our judgment the court erred in refusing to permit redirect examination of appellant's neurological surgeon, such error has not been shown to have been prejudicial or to have affected the amount of the verdict. Accordingly, we affirm.

---

1. The situation here is unlike that presented when there is an alleged inadequacy of verdict but no claim of error by the trial court either in its rulings on evidence or in its instructions to the jury. See Kirkpatrick v. Zimmerman, 257 Md. 215, 262 A. 2d 531 (1970) where it was emphasized that the granting of a new trial solely because of inadequacy of damages awarded by a jury was within the sound discretion of the trial court, upon a motion for a new trial, whose action would not be disturbed by the Court of Appeals. See also Leizear v. Butler, 226 Md. 171, 179, 172 A. 2d 518 (1961), and see White v. Parks, 154 Md. 195, 203, 140 A. 70, 74 (1928), where it was held that the size of the verdict can be "given weight" in the Court of Appeals only where, "if legal error is found in the rulings of the trial court, it becomes necessary to consider if the amount of the judgment is indicative of injury to the appellant."

## I

Appellee, Donald Dolan, an employee of appellee, Charles Leitch, was driving a dump truck, owned by Leitch, in a northerly direction on Reisterstown Road, Baltimore County, on November 7, 1973, when he negligently turned in front of the appellant, Catherine H. Feeney,[2] operating a 1969 Pontiac and traveling in the opposite direction. The inevitable collision resulted in property damages of $1,157.47 to appellant's car.[3]

According to Mrs. Feeney's testimony, upon impact she was thrown about in her vehicle, striking her head on the windshield, her knee on the steering column, and her side on the left door panel. She was driven from the scene to the law office where she was employed. A physician in the same building examined her. She complained at that time of head and neck pains and a sore knee. The doctor, according to Mrs. Feeney, prescribed bed rest and certain muscle relaxants. The next day she began to experience low back pain, in addition to her previous complaints. She was seen by Dr. Stuart H. Brager, a specialist in internal medicine, board certified, and an instructor at the University of Maryland School of Medicine, who undertook treatment as her primary care physician.

Dr. Brager's examination of the patient the day after the accident revealed a spasm in the paraspinal muscles from approximately the second through the fifth lumbar vertebrae. The palpable spasm in her lower back, he said, resulted in restricted movement not only in forward bending but also in extension and lateral tilt. He recommended a conservative treatment of physical therapy sessions with a "wait and see" attitude, and prescribed painkillers and muscle relaxants. After some 8 to 12 physical therapy sessions, Mrs. Feeney's office visits with Dr. Brager

---

**2.** At the time of trial appellant had remarried and was sometimes referred to in the proceedings as Catherine Simon.

**3.** The bill was introduced into evidence by stipulation between the parties only as evidence of the severity of the collision and not as an element of appellant's damages.

terminated in January, 1974. Dr. Brager concluded that Mrs. Feeney had "a reinjured lumbar sprain which was superimposed on this prior post-dissectomy status."

As suggested by the internist's diagnosis, Mrs. Feeney's back troubles predated the 1973 accident. In May of 1968, while working at the Townhouse Motor Hotel as a clerk, she injured her back in a fall down a flight of stairs. This incident resulted in surgery by the late Dr. Clinton Harrison in July, 1968 at Mercy Hospital. Dr. Harrison's operative notes were admitted into evidence. They disclosed that he had performed an excision of ruptured discs at L4 and L5.

After the operation by Dr. Harrison, appellant was seen by Dr. Edward G. Reahl, Chief of Orthopedics at Mercy Hospital, who testified that he first examined her in March, 1969, at the request of her attorney, in order to evaluate her condition for a pending Workmen's Compensation claim arising out of the stairway fall. Her complaints at that time consisted of pain beginning in her back radiating down her left leg all the way to her toes. His opinion was that as a result of the 1968 accident, "she sustained a herniated lumbar disc with persistent symptoms referable to her back and leg." On cross-examination he testified, without objection, that her post-operative condition in 1969 amounted, in his opinion, to a 35% permanent partial disability of the back.

With respect to the 1973 accident, Dr. Reahl testified that he examined the appellant at the request of her internist, Dr. Brager, in December, 1975. In his opinion, she had a recurrence of the L4-L5 disc as well as a rupture of the L3-L4 disc as a result of the accident, and she had "a significant, residual permanent disability in her back." He did not, however, recommend a spinal fusion because of her history of pulmonary embolism.

According to Mrs. Feeney, she was unable to work for one year after the 1968 accident. By early 1970, however, improved by physical therapy, she resumed her employment and normal physical activities and her back presented no significant problems, except for sporadic episodes of pain. On cross-examination, without objection, she admitted that

she received a 30% permanent partial industrial disability from the Maryland Workmen's Compensation Commission as a result of the fall.[4]

As previously stated, she stopped receiving treatment from Dr. Brager in January, 1974. However, she recounted at trial that her back was "slowly getting worse" during the following months. The appellant and her fiance took a motor trip to Disneyworld, Florida in April, 1974.[5] Her testimony reveals that the entire drive was uncomfortable and by the time she returned to Maryland, a week later, the deteriorating condition of her back forced her to see Dr. Brager on April 30. An examination disclosed, in Dr. Brager's opinion, the signs of a ruptured disc. He also stated that, in retrospect, the symptoms, as exhibited by the patient in her December 1973 — January 1974 examinations, coupled with Mrs. Feeney's medical history, indicated that the ruptured disc was present when he first saw the patient immediately after her accident.

Dr. Brager referred Mrs. Feeney to Dr. Jerome Reichmister, an orthopedic surgeon at Sinai Hospital, who placed her in traction and then arranged a consultation with Dr. Neal Aronson, Chief of Neurosurgery at the hospital. The patient remained in traction from May 3rd to May 20th. A myelogram was then performed. Dr. Aronson testified that he and Dr. Reichmister decided, "after careful consultation with the patient who said she couldn't live with the symptoms that she had even after a full trial of conservative treatment," to proceed with exploratory surgery. This decision was made "reluctantly" because of appellant's history of pulmonary embolism after a hysterectomy.

---

4. Before the trial commenced, at proceedings in chambers, appellant's counsel had unsuccessfully sought a ruling by the trial judge that neither the percentage of disability found by the Commission nor the amount of the award was admissible. The trial court ruled, "I am not going to admit the dollar amount, but I am going to admit the percentage. That is a judicial determination."

5. At the same proceedings in chambers prior to trial, appellant's counsel asked for a ruling that the fact that appellant and her fiance shared the same room during this trip was irrelevant "in the absence of any evidence to suggest that something happened in that room to cause her to have a back condition." This was denied.

According to Dr. Aronson, he removed a ruptured disc located in the midline between the 3rd and 4th lumbar vertebrae as well as a "recurrent disc rupture" between the 4th and 5th vertebrae. Dr. Aronson stated that the latter rupture was the same disc previously removed in Dr. Harrison's procedure in 1968.

On cross-examination, he testified that the results of his final examination of the patient in August, 1975 negatived a spinal fusion because of the success of the May surgery. Although the appellant still complained of occasional nagging backaches, Dr. Aronson found no objective abnormalities.

Appellant introduced into evidence medical bills aggregating in excess of $8,000. She also testified that as a result of the car accident her loss of wages was approximately $8,000.

In his charge to the jury, the trial judge instructed that "there is no legally sufficient evidence in this case that the plaintiff will require any future medical treatment or incur any future medical expenses other than drugs." [6]

## II

On direct examination, appellant's counsel elicited from Dr. Aronson, who performed the exploratory surgery of appellant's spine in May 1974, the medical history which he obtained from Mrs. Feeney, his findings upon examination, and the results of the operation. Based on the information derived from these three sources, in response to the inquiry whether there existed a causal relationship between "the rupture that you found" (in May, 1974) and the automobile accident of November 1973, Dr. Aronson stated:

"Well, this is a preamble that I always give when I am asked to testify. I was called in as a consultant and a treating doctor in this case. I was not the initial treating doctor who saw this lady after her injury. I have to rely upon her believability and

6. There was no exception by appellant to the instruction.

honesty as a person in determining causal relationship. *If one takes for granted that the history she gave me was correct, then I would have to assume that the recurrence of her disc trouble was the result of the injury that she sustained.* But everything depends upon the honesty of the patient, because obviously I did not treat her initially, had not been treating her prior to this accident and was not intimately aware day to day what her symptoms were and how she was doing, remembering that she had prior disc trouble five years before. *So if a consultant or a secondary doctor that comes into the picture later on, the history as given by the patient to him is the only thing upon which I can base my conclusions.* And, I therefore have to say as I have already stated, *if the history given to me is correct, then a causal relationship exists in my opinion.*" (Emphasis added.)

Apparently in the light of Dr. Aronson's expressed dependence upon the veracity of the patient in relating medical history, counsel for the appellees on cross-examination exposed certain discrepancies in the medical history upon which the physician had relied. Thus, counsel's cross-examination established:

1. Dr. Aronson was under the impression that appellant's low back pain in 1968 radiated into the *right* leg as compared to her complaint of *left* leg radiating pain in 1974.

2. He believed that the appellant's back complaints began about one month before he saw her, that is, in April 1974, some five months after the car accident.

3. He received no history that the appellant complained of her back or received any treatment for her back following the November 1973 accident.

On all three points Dr. Aronson's history was in error. Both appellant's testimony and the medical records in evidence revealed that the 1968 back injury was productive of pain radiating to the *left* leg. Furthermore, the appellant's complaint of low back pain originated within forty-eight hours of the accident and she had received physical therapy treatments under the care of Dr. Brager.

Apparently disturbed by these revelations, Dr. Aronson altered his previous testimony when asked on cross-examination his opinion as to causal relationship. The following appears in the transcript:

"Q. So that there was a recurrence of the disc at L4-5 resulting from the previous surgery, is that right?

A. *I cannot answer that question. I don't know what it resulted from.*

Q. So you have no opinion as to the cause of the recurrence of the ruptured disc at L4-L5 level, is that correct?

A. Can I only say this? Trauma is a very important cause of disc protrusion, and *it is not unlikely that the injury that she sustained would have caused a recurrence, although if the symptoms had began immediately thereafter it would be easier to say that a definite causal relationship existed.*

Q. Do you have an opinion that you can state with a reasonable degree of medical certainty or probability that the accident of November 7, 1973 caused a recurrence of the ruptured disc at the L4-L5 level?

A. *In terms of reasonable medical probability, I would have to say I'm not sure.*

Q. Do you have an opinion that you can state with a reasonable degree of medical certainty or probability as to whether or not the accident on November 7, 1973 caused the ruptured disc that you found at the L3-L4 level?

A. *The answer is the same, I'm not sure.* I think it's highly possible but I can't —

Q. Don't you know, Doctor, you have been in Court enough times that we do not talk about possibilities.

A. That's right." (Emphasis added.)

With appellant's expert witness thus impeached, her counsel on redirect attempted to rehabilitate him. The following colloquy appears in the transcript:

"Q. (By Mr. O'Doherty) Dr. Aronson, in your direct examination you expressed the opinion that the condition you found based on the history was related to the accident of November 7, 1973, correct?

A. Yes.

Q. In your cross-examination — and you correct me if I'm wrong — you said that you couldn't say for sure?

A. Yes.

Q. Why did you say that?

(Mr. Cadigan) Objection.

(The Court) Overruled.

\* \* \*

Q. (By The Court) Doctor, the question is why you said you were not sure in response to the questions of Mr. O'Doherty and —

A. Because I looked over my notes more carefully. Your Honor, and I saw that there were certain things lacking there that I would really need in order to give a valid answer to that question. *That information may exist, but I don't have it.*

Q. (By Mr. O'Doherty) What is that information?

(Mr. Cadigan) Objection.

(The Court) Sustained.

Q. (By Mr. O'Doherty) You said there were certain factors lacking within the purview of your knowledge. What are those factors?

(Mr. Cadigan) Objection.

(The Court) Sustained. Come up to the Bench.

At The Bench

(The Court) I have sustained the objection because you have not gotten to the point the way you're going at it. You're taking the approach that you should have taken in direct examination, not in redirect examination. So I am not going to permit you to go any further.

(Mr. O'Doherty) If you don't mind, since I have to protect the record, by putting my two cents in. I proffer now that I am entitled to know those factors; and I point out to Your Honor that he did not say that was the reason because she gave a history of sciatic pain on the right and not on the left side. *I proffer to you what he said before is that he would want to know the history of her condition from the date of his first examination.* (Emphasis added.)

(The Court) Regardless of what he said, I'm telling you what the impact was, that as soon as he learned that the pain in 1974 radiated down the left leg rather than the right, he said — the question was put to him immediately after that — and he said, I'm not sure. My ruling is based upon the fact that you have an opinion which is negated by his cross-examination. You can't go ahead and try something on redirect that could have been done and should have been done on direct examination. If you want to make another proffer, go ahead."

The scope of redirect examination rests within the sound discretion of the trial judge, and his discretion is wide. *Bailey v. State*, 16 Md. App. 83, 111, 294 A. 2d 123, 138-39

(1972); *Fisher Body Division v. Alston,* 252 Md. 51, 56, 249 A. 2d 130, 133 (1969). Even inquiry into new matters, not within the scope of cross-examination, may be permitted; and a party is generally entitled to have his witness explain or amplify the testimony which he has given on cross-examination and to explain any apparent inconsistencies. *Mills v. State,* 12 Md. App. 449, 461-62, 279 A. 2d 473, 482 (1971). As stated in *Poe's Pleading and Practice*:

"Under direct examination resumed, the damaging effect of the cross-examination (in cases where it has proved damaging) is sought to be remedied as far as possible. *Explanations may be asked and given of injurious matter elicited under cross-examination*; and the consistency and accuracy of the witness may be shown. Indeed, the redirect examination of a witness, whom a severe cross-examination has shaken, frequently furnishes occasion for the exhibition of great tact and skill, and an unfortunate mistake or expression may be so adroitly explained away or corrected as to remove the unfavorable impressions created by the cross-examination." 3 H. M. Sachs, *Poe's Pleading and Practice* § 281 (6th ed. 1975). *Accord,* 4 S. Gard, *Jones on Evidence* § 26:30 (1972); 6 J. H. Wigmore, *Evidence* § 1896 (Chadbourn rev. 1976).

And in Wigmore, *supra,* the following rationale is presented:

"Honest misjudgments and inadvertent omissions often occur during the direct examination, and the repetition of particular parts may be desirable; while, on the other hand, the only danger to be guarded against is the unfair misleading of the opponent by the reservation of important testimony until the redirect examination, when he may have dismissed the needed witnesses in opposition.

"Accordingly, the general principle of the *trial court's discretion* is here fully recognized as

sanctioning, when necessary, the exceptional allowance of new testimony which could have been put in before, or of a repetition of matters already testified to." (Footnotes omitted.) *Id.* at § 1896.

We believe the trial judge should have permitted redirect examination of Dr. Aronson concerning the reasons for his uncertainty on the issue of causation; and that the trial court took too narrow a view in its ruling that appellant's counsel was improperly seeking to probe, on redirect, into matters that should have been the subject of direct examination. In the presentation of expert testimony by a treating physician, a party may elicit the witness' ultimate conclusion and "any details which the expert has personally observed can be elicited on direct or on cross-examination." *Langenfelder v. Thompson,* 179 Md. 502, 508, 20 A. 2d 491, 494 (1941). This was essentially the situation in the case *sub judice.* Furthermore, the facts tending to support the expert's conclusion had, without his knowledge, been testified to by other medical experts; and it was obviously this avenue of inquiry which appellant's counsel sought to pursue on re-direct. This should have been allowed.

Even if, however, the trial court erred in its ruling, it is incumbent upon appellant to establish that the error was prejudicial. *Beahm v. Shortall,* 279 Md. 321 (1977). Unless the error was "both manifestly wrong and substantially injurious," this Court will not reverse. *Rotwein v. Bogart,* 227 Md. 434, 437, 177 A. 2d 258, 260 (1962), *quoting* 2 J. P. Poe, *Pleading and Practice* § 287, at 249 (5th ed. 1925). "An error which does not affect the outcome of the case is 'harmless error.' " *I. W. Berman Properties v. Porter Bros.,* 276 Md. 1, 11-12, 344 A. 2d 65, 72 (1975); *accord, Beahm, supra. See Dorsey v. State,* 276 Md. 638, 350 A. 2d 665 (1976). It is also appellant's burden, where the adequacy of the verdict is at issue, to show that the amount of the judgment is "indicative of injury to the appellant." *White v. Parks, supra,* 154 Md. at 203.

Under the circumstances here presented, we conclude that error below was nonprejudicial. In appellant's case in chief, both Dr. Brager, a qualified internist, and Dr. Reahl, a

qualified orthopedist, testified, as treating physicians, that in their opinion the injuries and complaints exhibited by Mrs. Feeney subsequent to the automobile accident of November, 1973 were proximately cause by said accident. Appellant was not, by virtue of the court's ruling with respect to Dr. Aronson's redirect testimony, deprived of *any* expert testimony on the issue of causation. The jury obviously credited the other expert testimony they heard on this issue because they returned a verdict in favor of the appellant for $20,000. In order properly to have reached such a verdict, the jury must have concluded that the element of proximate cause was established. As for the effect of any error on the amount of the verdict, none has been suggested and we perceive none.

### III

Appellant also objects to the trial court's ruling permitting the appellees to inquire, on cross-examination, whether Mrs. Feeney shared a motel room with her then fiance, now husband, while on a trip to Florida in April, 1974. The affirmative response, the appellant contends, raised "a fair inference that the parties had sexual relations in the room," thereby prejudicing her in the eyes of the jury.[7]

Matters concerning the nature and scope of cross-examination — like those with respect to redirect examination — are within the sound discretion of the trial court whose ruling will not be disturbed in the absence of a showing of prejudicial abuse of discretion. *Fleming v. Prince George's County,* 277 Md. 655, 679, 358 A. 2d 892, 905 (1976);

---

7. Appellant, on redirect examination, denied that sexual relations had occurred. The trial court stated, in ruling the evidence admissible, "It's a fair inference that they did have sexual relations. Mr. Cadigan states that the lady had not had any medical attention of any kind for some three months prior to the trip, and after the trip the plaintiff complained of pain in her back. So that's the reason I am going to permit it." In appellant's brief, it is stated with some hyperbole, "The evidence disgraced, humiliated and degraded the witness" and that members of the jury may have felt that her back pain and surgery were "punishment inflicted by her Creator for her moral transgression and she consequently got what she deserved."

*Nottingham Village v. Baltimore County,* 266 Md. 339, 356, 292 A. 2d 680 (1972).

In determining the merits of appellant's contention it is essential to consider (a) the relevancy or not of the challenged evidence and (b) whether, if it be relevant, any of the recognized exclusionary rules precluded its admissibility.

With respect to the first factor, the challenged evidence must be viewed not in isolation but in its circumstantial context. Here, the appellant's direct testimony tended to establish that the accident of November 7, 1973 was the sole cause of her back problem and her surgery in May 1974, that prior to the accident she was free of symptoms of any low back involvement relating to her 1968 accident. Her own testimony, however, also established that the onset of renewed complaints of pain in the low back area was after the Florida trip and that upon her return from the trip she developed, for the first time since the 1973 accident, radiation of low back pain into her left leg. Accordingly, counsel for the appellees on cross-examination sought to develop that the onset of her disc symptomatology within the time frame of her Florida trip might have been related to (a) the automobile drive itself and (b) appellant's activities while in transit and in Florida. In this respect she was interrogated about discomfort while driving, visiting Disneyworld, the extent to which she walked, used public transportation and went on the amusements. Because the case presented a large issue with respect to the causal relationship between the 1973 accident and her subsequent back condition and surgery, the relevancy of this evidence is plain; and it is fundamental that relevant evidence being in some degree evidence that advances the inquiry and thus has probative value, is *prima facie* admissible. *McCormick on Evidence* § 185, at 438 (2d ed. 1972).

As for the second point of inquiry, were there counter-balancing factors which should have moved the court to exclude the challenged evidence on the ground that it outweighed its probative value? Chief among such counter-balancing factors is the danger that the fact offered

may unduly arouse the jury's emotions of prejudice. And as McCormick accurately observes, *supra*, at 439, n. 31, what is meant here is an undue tendency of the evidence to cause the trier of fact to decide the case on an improper basis "commonly, though not always, an emotional one." Because in the instant case all facets of appellant's trip to and from Florida were explored on cross-examination, we cannot say that the court abused its discretion in not acceding to appellant's request that evidence relating to appellant's sharing of a motel room with her then fiance, to whom she is now married, was prejudicial and that its probative value was substantially outweighed by the risk that its admission would cause undue or unfair prejudice. *See* S. Gard, *Jones on Evidence* § 4:6 (6th ed. 1972).

## IV

Finally, appellant asserts that the trial court erred in permitting appellees' counsel to refer in opening statement to the fact that Mrs. Feeney received a 30% permanent partial industrial disability from the Workmen's Compensation Commission as a result of her 1968 low back injury; and also in permitting the same evidence to be read to the jury, during the trial, from the order of the Commission. It is contended that such evidence was irrelevant and prejudicial.[8]

We find that appellant waived her right to object on appeal to the admission of this evidence, for two reasons. First, the rule is clear that in order properly to preserve an objection to opposing counsel's alleged prejudicial comments made during argument to the jury, there must be a request for remedial action. A curative instruction must be requested or a motion for mistrial made; a mere objection is insufficient. *Dorsey Bros. v. Anderson*, 264 Md. 446, 454-55, 287 A. 2d 270, 275 (1972); *Tully v. Dasher*, 250 Md. 424, 440, 244 A. 2d 207, 216 (1968). The same principle applies to an opening statement. Here, the appellant merely objected to

---

8. See n. 4, *supra*, with reference to the denial by the court immediately before trial of appellant's request for the exclusion of this evidence.

the alleged prejudicial comment. Secondly, *without objection*, the very testimony which appellant sought to exclude was elicited from Mrs. Feeney on cross-examination when she testified that she received a 30% rating as a result of her Workmen's Compensation claim. The subsequent reading of the percentage from the Commission's order was merely cumulative and the objection, made at that point, came too late. Maryland Rule 522 d. 2. states:

> "Time To Be Made — Waiver.
> Every objection to the admissibility of evidence shall be made at the time when such evidence is offered, or as soon thereafter as the objection to its admissibility shall have become apparent, otherwise the objection shall be treated as waived."
> *See Forrester v. State*, 224 Md. 337, 343-44, 167 A. 2d 878, 881 (1961).

Even if the questions were properly preserved, we would find that the trial court's actions in permitting introduction into evidence of the Commission's determination of percentage disability was proper.[9] The critical question in this case was whether the appellees' negligence caused Mrs. Feeney's injuries, and, assuming causation, to what extent the appellant's previous injury to her back in 1968 contributed to her present complaints. Evidence of the appellant's pre-existing back condition was, therefore, extremely relevant to the jury's determination. *See Burns v. Shields*, 256 Md. 537, 261 A. 2d 161 (1970); *Kantor v. Ash*, 215 Md. 285, 137 A. 2d 661 (1958). The importance of this issue was emphasized by the trial court in its charge to the jury:

> "It is for you to determine whether any of the plaintiff's present complaints or disability result from the automobile accident in November 1973, or whether they result from her accident at the Town House Motor Motel in May 1968, or a combination of both accidents. If you should find from the evidence that the plaintiff had disabilities which

---

9. The court did not permit the disclosure to the jury of the monetary amount of compensation awarded.

pre-existed the accident involved in this case, nevertheless, if you further find that such accident aggravated such pre-existing disabilities, then the defendants are not relieved of the responsibility for the consequences of their negligence by showing that the injury would have been of less severity if it had been inflicted on someone without the plaintiff's pre-existing disabilities. On the contrary, the defendants remain liable for all damages and injuries sustained by the Plaintiff, which you find resulted from the aggravation of her pre-existing disabilities.

"If you find that the plaintiff has a permanent disability to her low back, it is for you to determine whether any portion of that disability pre-existed the accident complained of in this case. *You are to award damages only for that portion of the permanent disability, if you so find, which you may find was caused by the November 1973 accident.*" (Emphasis added.)

The Commission's determination of disability was received as evidence of the appellant's pre-existing condition. Its order did in fact determine an issue relevant to the instant litigation. *See McCormick on Evidence, supra,* § 185. Its admissibility is clear. Also before the jury, without objection by appellant, was Dr. Reahl's evaluation of her disability at 35% and Dr. Harrison's assessment of 15% to 20%. The *weight* to be given by the jury to the respective evaluations was not the subject of a requested instruction and the trial court gave none. We find it unnecessary to decide the question.

*Judgment affirmed; appellant to pay the costs.*